JOHN VISPISIANO AND BARBARA VISPISIANO, HIS WIFE, PLAINTIFFS-APPELLANTS, AND GENE CONLON AND NAN CONLON, HIS WIFE, PLAINTIFFS, v. ASHLAND CHEMICAL CO., M & M MARS, MARKTEX CORPORATION, ELCO SOLVENTS, BECTON DICKINSON COMPANY, CELANESE CORP., MAAS & WALDSTEIN COMPANY, ALPHA METALS INC., GENERAL FOODS CORPORATION, INMONT CORPORATION, JOHNSON & JOHNSON, KAISER ALUMINUM & CHEMICAL, FMC CORP., AIR PRODUCTS & CHEMICALS, INC., CHARLES OF THE RITZ, ROWE INTERNATIONAL, INC., EMULSITONE COMPANY, WARNER-CHILCOTT LABS, ITT RAYONIER INC., SUN CHEMICAL COMPANY, SEALED AIR CORPORATION, AMERICAN CYANAMID CO., ORTHO PHARMACEUTICAL CORP., ORTHO DIAGNOSTICS INC., STERLING DRUG INC., AMERICAN HOECHST CORP., ALCAN ALUMINUM CORPORATION, EXXON CORP., COSMAIR INC., J.B. WILLIAMS CO., INC., LILLY INDUSTRIAL COATINGS CO., INC., AND CONGOLEUM INDUSTRIES, INC., DEFENDANTS-RESPONDENTS, AND STRANAHAN FOIL COMPANY, HAWARD CORPORATION, NASSAU CHEMICAL CORPORATION, ARVEY CORPORATION, NAPCO CHEMICAL DIVISION, TENNECO CHEMICALS INCORPORATED, TEMPIL, SANDOZ-WANDER INCORPORATED, BATES MANUFACTURING COMPANY, DIAMOND SHAMROCK CORPORATION, MENNEN COMPANY, NATIONAL STARCH & CHEMICAL COMPANY, REICHHOLD CHEMICALS INCORPORATED, BRISTOL MEYERS PRODUCTS, MILTON CAN COMPANY, ALUMINUM SHAPES INCORPORATED, LIGHTMAN DRUM COMPANY, AND THIOKOL CORPORATION, DEFENDANTS.

Argued January 23, 1986—Decided June 29, 1987.

418

*Jane B. Cantor* argued the cause for appellants (*Garuto, Galex & Cantor,* attorneys; *Ms. Cantor* and *Carol F. Gerity,* on the briefs).

*Michael D. Loprete* argued the cause for respondents (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys for Johnson & Johnson, Ortho Pharmaceutical Corp., and Ortho Diagnostics Inc.; *Pitney, Hardin, Kipp & Szuch,* attorneys for J.B. Williams Co., Inc.; *Tompkins, McGuire & Wachenfeld,* attorneys for Lilly Industrial Coatings Co., Inc.; *Connell, Foley & Geiser,* attorneys for Emulsitone Company; *Dughi & Hewit,* attorneys for Congoleum Industries, Inc. and Warner-Chilcott Labs; *Hanlon, Dempsey & McHeffey,* attorneys for General Foods Corporation; *Hoagland, Longo, Oropollo & Moran,* attorneys for Maas & Waldstein Company; *Lasser,*

*Hochman, Marcus, Guryan & Kuskin,* attorneys for Alpha Metals Inc. and Kaiser Aluminum & Chemical; *Levinson, Conover, Axelrod & Wheaton,* attorneys for Inmont Corporation; *McCarter & English,* attorneys for Alcan Aluminum Corp.; *Paul X. McMenaman,* attorney for Sun Chemical Company; *Melli & Doyne,* attorneys for Charles of the Ritz; *Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys for American Hoechst Corporation, Ashland Chemical Company and ITT Rayonier Inc.; *Morley, Cramer, Tansey, Haggerty & Fanning,* attorneys for Elco Solvents; *Moser, Roveto, McGough & von Schaumburgh* attorneys for M & M Mars; *Purcell, Ries, Shannon & Mulcahy,* attorneys for Sterling Drug Inc.; *Ronca, McDonald, Judge & Hanley,* attorneys for Marktex Corporation; *Scanlon & Robinson,* attorneys for Cosmair Inc.; *Sills, Beck, Cummis, Zuckerman, Radin & Tischman,* attorneys for Becton Dickinson Company; *Kirsten, Simon, Friedman, Allen, Cherin & Linken,* attorneys for Sealed Air Corporation; *Wilson, Elser, Moskowitz, Edelman & Dicker,* attorneys for Air Products & Chemicals, Inc., American Cyanamid Co., Celanese Corp., Exxon Corp. and FMC Corp.; *Michael D. Loprete, Robert L. Hollingshead* and *Claire T. Barile,* on the brief).

*Peter A. Piro* submitted a letter in lieu of brief on behalf of respondent Rowe International, Inc. (*Haskins, Hack, Piro, O'Day, Merklinger & Wallace,* attorneys).

PER CURIAM.

■ The "discovery rule" is an equitable principle by which the accrual of a cause of action is delayed "until the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered[,] that he may have a basis for an actionable claim." *Viviano v. CBS, Inc.,* 101 *N.J.* 538, 546 (1986) (quoting *Lopez v. Swyer,* 62 *N.J.* 267, 272 (1973)). This appeal involves the application of the "discovery rule" to a toxic-tort case. Plaintiffs are John Vispisiano and his wife, Barbara. "Plaintiff" hereafter is intended to indicate John; Barbara Vispisiano will be referred to as plaintiff's wife. (A

companion case of plaintiffs Gene Conlon and Nan Conlon, his wife, is not part of this appeal.)

Plaintiff seeks recovery of damages for medical complications and bodily injuries resulting from his exposure to toxic chemical wastes during his six-months employment at a toxic-waste disposal site. His complaint against numerous suppliers, processors, manufacturers, and distributors of toxic-waste materials was dismissed as having been filed beyond the time allowed by the applicable statute of limitations, and the Appellate Division affirmed. We granted certification, 101 *N.J.* 323 (1985). We now reverse.

I

Plaintiff's exposure to the offending materials occurred during the period of his employment with Chemical Control Corporation in Elizabeth from October 1977 to April 14, 1978. He started this suit, based on negligence and willful and wanton misconduct, on March 12, 1982, almost four years after the final date of his employment with Chemical Control. The issue is whether by application of the "discovery rule" it may be said that the date on which plaintiff filed his complaint falls within the two-year period next after plaintiff's cause of action accrued, as required by *N.J.S.A.* 2A:14–2, the statute of limitations governing personal injury actions. Put differently, the question is whether plaintiff's cause of action accrued before March 12, 1980, as defendants contend and as the courts below determined, or after that date, as plaintiff argues.

The fact-sensitive nature of our inquiry requires a careful review of the evidence as disclosed at the so-called *Lopez* hearing, conducted in keeping with the procedures established in *Lopez v. Swyer, supra,* 62 *N.J.* 267 to determine if plaintiff's cause of action accrued more than two years prior to the date on which he filed his complaint. The record of that hearing includes not only the testimony of plaintiff and his treating physician but also various medical records, excerpts from testi-

mony in other proceedings and from depositions and answers to interrogatories, and part of a journal kept by plaintiff's wife.

At the time of the *Lopez* hearing plaintiff was thirty-four years old. His employment duties during his six months at Chemical Control included unpacking fifty-five gallon drums of various types of bottled chemicals packed in vermiculite, pumping flammable liquid chemicals from drums into a large holding tank, and "help[ing] out" when somebody needed assistance. By way of significant medical history we note that in 1968 he experienced migraine headaches as the result of an automobile accident, and that between 1968 and 1977 he was treated for headaches "a couple of times."

On January 17, 1978, plaintiff sought medical treatment for para-nasal congestion. The physician's note related that plaintiff "works at Chemical Control * * * near vermiculite * * *." The prescribed treatment required Vispisiano to stop using a nasal spray and to return for a follow-up visit.

Recall that the period of plaintiff's employment with Chemical Control was October 1977 to April 14, 1978. Sometime between the beginning of his employment and March 1, 1978, plaintiff began to experience swelling in various parts of his body, and to break out in rashes. He suffered from insomnia as well. Therefore, on March 1, 1978, he consulted Dr. Sandra Moss, an internist at the Rutgers Community Health Plan (RCHP), for treatment of the swelling and rashes and for diagnosis of those conditions. Dr. Moss was unable to pinpoint a cause of plaintiff's symptoms, but she considered plaintiff's recent marriage and new occupational responsibilities as possible causative factors. (Plaintiff's wife attributed the rashes to sun poisoning.) In a clinical note that was not disclosed to plaintiff Dr. Moss wrote: "Note marked chemical exposure."

On March 18, 1978, Vispisiano was rushed to the St. Peter's Medical Center Emergency Room suffering from severe migraine headaches. There he underwent several tests and was

eventually admitted by Dr. Philip Thurston. As evidenced by the doctor's report, plaintiff had previously suffered migraines:

> This is a 29 year old white male, * * * who had a sudden onset of the worse[sic] headaches of his life * * * 6 days ago. This accompanied by vomiting, no loss of consciousness. * * * Approximately 3 days ago the patient had a similar sudden severe headache * * * and at that time he was admitted to St. Peter's * * *.

The diagnosis was vascular headaches, migraine variant. After a three to four day stay Vispisiano was discharged and directed to take aspirin and Caforgot, a drug used to combat migraines. Significantly, the discharge summary sheet listed the final clinical diagnosis as "Headaches undetermined etiology."

On both March 31 and June 7, 1978, plaintiff saw Dr. Thurston. The March 31 visit was a follow-up at which the doctor learned that the headaches had subsided. By the time of the June visit the headaches had vanished. Dr. Thurston's clinical note of March 31 reads: "I do not believe this patient has any significant health problems," and the one from June Seventh indicates that when plaintiff quit work at Chemical, the headaches ceased. Specifically, Dr. Thurston testified at the *Lopez* hearing that Vispisiano's "headaches got better because he had—had changed or quit this job * * *." As the doctor recalled it, "I thought that his headaches might have been related to the stress of his job, you know, vascular headaches are made worse by high emotional stress." This theory was communicated to plaintiff, who then interpreted it to mean "[the doctors] just came up, I think, with migraine, but I had stress from the chemicals."

It was not until February 16, 1980, after plaintiff had consulted other RCHP physicians—the record is uninformative on the purpose of those visits—that plaintiff returned to Dr. Thurston. This appointment was prompted by plaintiff's complaint of foot pain and swelling. Early testing for gout proved inconclusive.

Thereafter, some time between February 25 and March 4, 1980, Vispisiano visited Eugene Conlon, a former Chemical Control employee and friend, who was hospitalized at St. Pe-

ter's. During the visit plaintiff learned that Conlon was exhibiting symptoms similar to his own. Their discussion raised the possibility that those symptoms might have been caused by chemicals. Vispisiano testified, however, that in "speaking to my doctors, they said no." Plaintiff further expressed the thought that the source of the rashes and swelling might have been food, detergent, soap, or "men's problems." Finally, the record contains plaintiff's wife's deposition testimony that she and her husband had considered chemical contamination as a possible cause of his complaints, but because they "didn't get any answers from the doctors as to these illnesses," they speculated that the source of the problem might be food allergies. In fact, beginning in May 1981, plaintiff's wife kept a daily log of her husband's "health, things [he] ate."

As a result of his conversation with Conlon, Vispisiano called Dr. Thurston on March 4, 1980, and left the following message:

re. [illegible word] Swollen foot. Had blood work done. Works for Chem. Co. Thinks he has Chem. contamination in system and co-workers in hospital presently has same symptoms. Wants to speak to you.

When the doctor returned the call, an appointment was set up for March 13, 1980. The clinical note for that examination reads:

Pt very concerned because a former co-worker was recently admitted to the hospital because of constitutional SX & wt loss, extensive. W/u proved negative. Pt worried about future fertility because his friend had testicular swelling & pt had also had this in past—thinks there may be a problem because of exposure to chemicals.

According to Dr. Thurston's testimony at the *Lopez* hearing, he did not "draw any conclusions" about a possible connection between plaintiff's condition and his exposure to chemicals. The doctor was specific on this point: he did not imply to plaintiff any opinion that such exposure was the cause of his problems, and in fact Dr. Thurston did not believe, on March 13, 1980, that plaintiff's condition was related to chemical exposure. His note on the medical record of his consultation that date reads: "doubt any significant pathology, but patient will need reassurance." The doctor testified that ultimately he

diagnosed plaintiff's condition as angio-edema, a condition with a number of causes but one that in seventy per-cent to eighty per-cent of the cases is labelled "ideopathic, meaning the cause is unknown." Finally, Dr. Thurston said that a test he performed in April 1981 for a "familial" form of angio-edema yielded a normal result.

At Dr. Thurston's suggestion plaintiff was examined on May 21, 1981, by Dr. Okie, an allergist, whose clinical note following that examination reads (to the extent that it is legible):

angioedema 3 yrs-duration. No pattern—on feet testicles—mouth & hands—worked for toxic chemical company—got worse after working—worked for over 1 year now doesn't.

Several lines below the foregoing, and over Dr. Okie's signature, is the notation "Suspect autoimmune to chemicals," followed by what may be a prescription for medication. Dr. Okie saw plaintiff on two additional occasions, on June 2, 1981, and probably (the date on the record is unclear) July 16, 1981. According to plaintiff, Dr. Okie "wouldn't rule out" chemical exposure as the cause of his symptoms, but "he checked into it" and then consulted with Dr. Daum, another RCHP physician. It was she who ultimately related plaintiff's condition to toxic chemical exposure, in August 1982.

On the basis of the evidence recited above the trial court granted defense motions for dismissal of plaintiff's complaint as time-barred. Pertinent portions of the trial court's letter opinion read as follows:

On June 7, 1978, Vispisiano told his physician, Dr. Thurston, that his reoccurring headaches had stopped since terminating his employment at Chemical Control. Plaintiff noted that he felt better after quitting. By these facts alone, plaintiff should have known that his exposure to chemicals might have caused his symptoms.

\*     \*     \*     \*     \*     \*     \*     \*

In the latter part of February in 1980, plaintiff visited a co-employee, Eugene Conlon, in St. Peter's Hospital. Conlon had been exposed to chemicals and was experiencing similar symptoms as Vispisiano. Conlon had intended to contact other employees exposed to chemicals. Shortly after meeting with Conlon, Vispisiano told Dr. Thurston of his concern over his co-employee's symptoms. Plaintiff expressed his suspicions that his own symptoms were caused by

chemical contamination in his system. Thus, Vispisiano clearly knew before March 12, 1980, that exposure to chemicals might have caused his injuries.

The Appellate Division, in an unreported opinion, affirmed substantially for the reasons given by the trial court. The court below focused on "when plaintiff gained knowledge of possible fault through industrial exposure," and concluded that "[t]he evidence was clear that his suspicions were aroused prior to March 12, 1980, since he called Dr. Thurston on March 4, 1980, and expressed his concerns as to a causal connection between his symptoms and chemical exposure in the message he left with the nurse." The issue as framed by the Appellate Division was "whether [plaintiff] was entitled to await medical confirmation of such a connection or at least the possibility of such a connection before the limitations period began to run"— an inquiry that the court below answered in the negative. Finally, the Appellate Division concluded that plaintiff could not have relied on any representation that his symptoms were not work related:

Plaintiff testified that his doctors "said no" when he raised the possibility that his problems were related to chemical exposure, but Dr. Thurston's testimony did not indicate that he ever directly told plaintiff that the chemicals could be eliminated as a causal factor, although it is also clear that he did not indicate that they were a factor. Under the circumstances we think the judge was justified in concluding that Thurston "neither confirmed nor quelled his [plaintiff's] suspicions concerning the effect of chemical exposure."

II

Although the statute of limitations governing actions for personal injury, *N.J.S.A.* 2A:14–1, requires that suit be started within two years after the cause of action shall have accrued, the legislature has not "sought to define or specify when a cause of action shall be deemed to have accrued * * *." *Fernandi v. Strully*, 35 *N.J.* 434, 449 (1961). That determination has been left to judicial interpretation, *Aruta v. Keller*, 134 *N.J.Super.* 522, 527 (App.Div.1975); *see Fernandi, supra,* 35 *N.J.* at 439, 449; Note, *Developments in the Law, Statutes of Limitations,* 63 *Harv.L.Rev.* 1177, 1203–05 (1950), and the yield of the endeavor has been bountiful indeed. See, *e.g., Viviano*

v. *CBS, Inc., supra,* 101 *N.J.* at 546; *Lynch v. Rubacky,* 85 *N.J.* 65, 69–70 (1981); *O'Keeffe v. Snyder,* 83 *N.J.* 478 (1980); *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291 (1978); *Fox v. Passaic Gen. Hosp.,* 71 *N.J.* 122 (1976); *Moran v. Napolitano,* 71 *N.J.* 133 (1976); *Lopez v. Swyer, supra,* 62 *N.J.* at 272; *Fernandi v. Strully, supra,* 35 *N.J.* at 449–50; *Mancuso v. Mancuso,* 209 *N.J.Super.* 51, 54–55 (App.Div.1986); *Jarusewicz v. Johns-Manville Prods. Corp.,* 188 *N.J.Super.* 638, 643–44 (Law Div.1983).

As the Court explained in *Farrell v. Votator Div. of Chemetron Corp.,* 62 *N.J.* 111 (1973), the purpose of statutes of limitations is to stimulate litigants to pursue their causes of action diligently and to "spare the courts from litigation of stale claims." *Id.* at 115 (quoting *Chase Sec. Corp. v. Donaldson,* 325 *U.S.* 304, 314, 65 S.Ct. 1137, 1142, 89 *L.Ed.* 1628, 1625 (1945). When an injured person sleeps on his rights so long as to let the customary period of limitations expire, "the pertinent considerations of individual justice as well as the broader considerations of repose[ ] coincide to bar his action." *Ibid.*

> Where, however, the plaintiff does not know or have reason to know that he has a cause of action against an identifiable defendant until after the normal period of limitations has expired, the considerations of individual justice and the considerations of repose are in conflict and other factors may fairly be brought into play.
> [Ibid.]

To reach a just accommodation of those considerations courts developed the so-called "discovery principle," adopted in New Jersey in *Fernandi v. Strully, supra,* 35 *N.J.* 434. The essential purpose of the rule is to avoid harsh results that otherwise would flow from mechanical application of a statute of limitations. *See Mancuso v. Mancuso, supra,* 209 *N.J.Super.* at 56–57. The rule therefore functions to modify the conventional statutory period but only to the extent of postponing the accrual of a cause of action until the plaintiff "learns, or reasonably should learn, the existence of that *state of facts* which may equate in law with a cause of action." *Burd v. New Jersey Tel. Co., supra,* 76 *N.J.* at 291.

■ Although the rule has cropped up with some frequency in medical malpractice cases, *see, e.g., Fox v. Passaic Gen. Hosp., supra,* 71 *N.J.* 122; *Moran v. Napolitano, supra,* 71 *N.J.* 133; *Lopez v. Swyer, supra,* 62 *N.J.* 267; *Fernandi v. Strully, supra,* 35 *N.J.* 434, it has also been applied in a variety of other categories of actions. *See Mancuso v. Mancuso, supra,* 209 *N.J.Super.* at 55–56 (collecting cases). The "discovery rule" is called into play "when a party is either unaware that he has sustained an injury or, although aware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another * * *." *Tevis v. Tevis,* 79 *N.J.* 422, 432 (1979). One's awareness of an injury or deleterious condition does not always equate with the accrual of a cause of action. At times, as in this case, "the inquiry must focus upon fault as well as injury where the awareness of the fault is not self-evident in the injury." *Jarusewicz v. Johns-Manville Prods. Corp., supra,* 188 *N.J.Super.* at 643 (citing *Lynch v. Rubacky, supra,* 85 *N.J.* at 72–73 & n. 1; *see Bonney v. Upjohn Co.,* 129 *Mich.App.* 18, 342 *N.W.*2d 551, 557 (Ct.App.1983) (discovery rule applies to situation in which cause of injury is not implicit in injury itself, as in product liability claim against drug manufacturer); *see also* Annotation, *Statute of Limitations: Running of Statute of Limitations on Products Liability Claim Against Manufacturers as Affected by Plaintiff's Lack of Knowledge of Defect Allegedly Causing Personal Injury or Disease,* 91 A.L.R.3d 991, 999–1001 (1979) [hereinafter *ALR* Annotation] (discussing cases in which statute of limitations was tolled because plaintiff's damages were gradual and not accompanied by actual or perceptible trauma that would lead to recognition of causal connection between product and injury).

As distilled from the foregoing principles, then, the critical question in this case is when Vispisiano discovered or should have discovered, by exercise of reasonable diligence and intelligence, that the physical condition of which he complains was causally related to his exposure to chemicals at Chemical Con-

trol. We are instructed by *Lopez v. Swyer, supra,* that each case calls for an identification, evaluation, and weighing of the equitable claims of the parties, 62 *N.J.* at 274, in order to test the conclusions of the courts below "not so much upon the facts as determined by the trial court as upon the legal significance of [those] facts * * * specifically in terms of knowledge of fault as a constituent element of the discovery rule." *Lynch v. Rubacky,* 85 *N.J.* at 70.

> That inquiry, though basically factual, should be punctilious and probing. The interplay of the conflicting interests of the competing parties must be considered. The decision requires more than a single factual determination; it should be made * * * with a conscious[ness] of the equitable nature of the issue * * *.
>
> To the extent that fault is not self-evident or obviously revealed by the injury itself, the judicial search into an aggrieved party's knowledge of possible fault must be commensurately exacting.
>
> [*Id.* at 73–74 (quoting *Lopez v. Swyer, supra,* 62 *N.J.* at 275).]

▉ Among the factors to which courts look in deciding whether a plaintiff is equitably entitled to the benefit of the "discovery rule" are the nature of the injury and the difficulty inherent in discovering certain types of injuries. *See Lopez, supra,* 62 *N.J.* at 276; *ALR* Annotation, *supra,* at 999–1001; Note, *Statute of Limitations—Discovery Rule Construed to Permit a Claimant Two Full Years in which to File Suit from Time of Actual or Constructive Discovery of Cause of Action,* 8 *Seton Hall L.Rev.* 134, 145 n. 65 (1976) (citing *Owens v. White,* 342 *F.*2d 817, 820 (9th Cir.1965)). In the typical toxic tort situation those obviously interrelated factors may radically alter the balance of interests.

> Toxic tort victims do not become aware of their injuries until decades after the tortious act. Thus, not simply the occasional plaintiff, but instead an entire class of plaintiffs is deprived of its claims by a toxic tort statute of limitations that bars suit before injuries so much as manifest themselves. Such a deprivation cannot be justified on the traditional ground that the victims "slept on their rights," until after their claims were barred. Nor can a toxic tortfeasor demand psychological protection from "surprise" suits brought against him decades after the tortious act when, like many asbestos manufacturers in the 1950's, he was or should have been aware that he was exposing others to a substance that would cause a statistically predictable incidence of latent disease.

[Note, *The Fairness and Constitutionality of Statutes of Limitations for Toxic Tort Suits,* 96 *Harv.L.Rev.* 1683, 1685 (1983) (footnotes omitted).]

Not the least reason for difficulty in determining the nature and source of toxic tort injuries is the fact there are approximately 5,000,000 organic chemicals and 500,000 inorganic substances used today, with another 10,000 *new* chemicals synthesized in the research labs each year, of which about 1000 enter commerce.  G. Nothstein, *Toxic Torts: Litigation of Hazardous Substance Cases,* § 1.01 at 2 (1984) [hereinafter Nothstein]. It is estimated that 63,000 chemicals are in fairly common usage in the United States.  *Ibid.*  "[M]any diseases which are induced by or aggravated by exposure to toxic substances are similar to diseases which are not related to that particular toxic exposure."  *Id.,* § 4.01 at 105.

These diseases tend to express themselves in the same manner regardless of the precipitating agent, and it is rare that diagnosis of the disease in a particular individual will unequivocally indicate either the causative agent or the source of that agent.

    \*    \*    \*    \*    \*    \*    \*    \*

In a standard accident tort action, the injury, its cause, and its origin are easy to identify.  In the toxic tort arena, the medically diagnosed injury is the first in a series of difficult facts to discover and allege.  The latency period associated with many toxic substance diseases is a major hurdle in the causation chain. [*Id.* § 4.01 at 105, § 13.04 at 370.]

Although we have an abiding awareness of the difficulty of applying, in the toxic tort area, the standards articulated in our case law for application of the "discovery rule," we nevertheless are satisfied that this appeal does not require us to do more than refine those established standards.  They need not be altered.  We can decide the matter without doing violence to precedent.

### III

The courts below approached the problem of determining when Vispisiano's cause of action accrued—that is, when he knew or should have known of a causal relationship between his condition and his exposure to chemicals—by reference to

discrete time frames. The trial court first looked to a stretch starting with plaintiff's employment at Chemical Control in October 1977 and ending with his acknowledgement to Dr. Thurston in June 1978 that his headaches had ceased with his leaving that job in April 1978. The court, relying on "still stronger evidence" for support of its view that the claim was time barred, then focused on the period that commenced with plaintiff's visit to his co-employee Conlon in the latter part of February 1980 and that ended sometime before March 12, 1980. By that time, according to the court, Vispisiano "clearly knew * * * that exposure to chemicals might have caused his injuries." The Appellate Division, by reference to the trial court's opinion, adopted the same time frames.

Both the trial court and the Appellate Division relied in large measure on our opinion in *Burd v. New Jersey Tel. Co.*, *supra*, 76 *N.J.* 284, to reach the conclusion that defendants were entitled to summary judgment. In *Burd* the plaintiff experienced dizziness and light headaches while working in a trench gluing together plastic pipes supplied by the New Jersey Telephone Company. 76 *N.J.* at 288. Invariably his symptoms would begin within one-and-a-half hours after he started to work with the glue and would subside about one hour after he finished. *Id.* at 289. The physician who testified in a worker's compensation proceeding drew a connection between the glue and plaintiff's heart attack. *Ibid.* This Court concluded:

> The regular incidence of lightheadedness and dizziness while using the glue, and the disappearance of the symptoms shortly after cessation of plaintiff's exposure thereto, together with the permissible inference from the proofs that plaintiff realized the connection between the glue and the symptoms (although at trial he denied such knowledge), furnishes a substantial credible basis for an inference of knowledge by plaintiff at least shortly after the heart attack that the exposure to the fumes of the glue in the warm trench was in some way related to that attack.
>
> [*Id.* at 292–93.]

The basis on which the courts below concluded that *Burd* supports summary judgment for defendant in this case appears to be that because Vispisiano's headaches, swelling, and rashes began shortly after he started work at Chemical Control and

ended shortly after he left that job, he should have known that his exposure to chemicals might have been the cause of his symptoms. In fact, the Appellate Division concluded that plaintiff "began to display *unmistakable* symptoms of chemical irritation in early 1978" and that "[t]he record strongly supports the conclusion that plaintiff suspected chemical exposure as the cause of his problems from the inception of the problems." (Emphasis added).

Similarly in respect of the second time frame—the one beginning with plaintiff's visit to Conlon in the hospital in late February 1980 and ending sometime before March 12, 1980 (two years before suit was started)—the trial court determined that after his discussion with Conlon, plaintiff "clearly knew * * * that exposure to chemicals might have caused his injuries." And the Appellate Division said that despite Vispisiano's testimony that his physicians said "no" when he raised the possibility that his problems were related to chemical exposure, Dr. Thurston "neither confirmed nor quelled [plaintiff's] suspicions concerning the effect of chemical exposure." That court held that Vispisiano's claim was barred because he was not entitled to await medical confirmation of a causal connection or the possibility of such a connection:

> We do not think that plaintiff in *Burd* had any greater knowledge of causal connection than plaintiff in this case. If plaintiff's cause of action in *Burd* accrued before receiving medical confirmation of a relationship between the glue and his heart attack, then we think plaintiff's cause of action in this case must be said to have accrued when his suspicions were aroused as to whether chemical exposure was the cause of his symptoms, even though no doctor yet had confirmed those suspicions.

We perceive sharp differences between the significant facts revealed in the record before us and those in *Burd,* such that *Burd's* holding does not mandate a different result here. We are reminded that Vispisiano had suffered from migraines since his 1968 automobile accident. The onset of severe migraine headaches began gradually after Vispisiano commenced work at Chemical Control and the headaches gradually subsided not merely when he left that job but after he was treated with

Caforgot and aspirin. Plaintiff's physician did not attribute the severity of the headaches to chemical exposure but rather to the stress component of his work situation—a psychological basis, in other words, rather than one to be found in pathology. In Dr. Thurston's opinion Vispisiano's "headaches might have been related to the stress of his job * * * and vascular headaches are made worse by high emotional stress." Plaintiff's own articulation of this diagnosis was that the doctors "just came up, I think, with migraine, but I had stress from the chemicals." The causal connection that was drawn was between his symptoms and high stress, not chemical exposure. In contrast to the almost unmistakable relationship (not, in the words of the Appellate Division here, mere arousal of suspicion) between Burd's exposure to the glue in a warm trench and the accompanying symptoms, which disappeared when he finished work and had removed himself from the offending environment, any connection between Vispisiano's condition and his employment circumstances was at best obscure, dim, vague, speculative.

Granted that the burden of proof rests with the party claiming the indulgence of the "discovery rule," *Lopez v. Swyer, supra,* 62 *N.J.* at 276, there simply was not sufficient evidential support for the trial court's conclusion that because of his work experience alone, "plaintiff should have known that his exposure to chemicals might have caused his symptoms." Our disagreement with the trial court—and, to the extent that it adopted the trial court's position, with the Appellate Division—is not directed at its findings of fact but rather at the significance to be attached to those facts. Moreover, we are persuaded that the Appellate Division's standard that would tie accrual of a cause of action to the time that a plaintiff's "suspicions" are "aroused" requires honing: it cannot comfortably or fairly be applied in a toxic tort case, at least not as stated by the court below.

## IV

Respondents emphasize, understandably, this Court's statement in *Lynch v. Rubacky, supra,* that hinged the non-accrual of Isabel Lynch's cause of action for medical malpractice to the absence of "knowledge of material facts sufficient to generate the belief or suspicion that her course of treatment" with defendant physician was improper. 85 *N.J.* at 77. The obvious argument is that when the proofs demonstrate an "arousal" of a plaintiff's "suspicion"—here, that Vispisiano's symptoms were caused by chemical exposure—the cause of action accrues and the statute of limitations begins to run.

The meaning to be ascribed to the word "suspicion" should take cognizance of the context in which it was used in *Lynch.* That case was an action for medical malpractice against an orthopedic surgeon who in the course of surgery on a fractured ankle inserted a pin that "should not have been there," 85 *N.J.* at 69, thereby causing further complications that required additional surgery by another physician. Both the defendant doctor and the physician who finally performed the corrective surgery reassured plaintiff, the first by advising her that her condition was "a natural part of the healing process," *id.* at 68, and the second by refraining from suggesting that the original surgeon's treatment itself had actually caused or contributed to her condition. *Id.* at 69, 76. This Court held that under the circumstances plaintiff was "not to be blamed" because she did not know enough to believe or suspect that defendant had provided her with improper medical treatment. *Id.* at 77.

As in *Alfone v. Sarno,* 139 *N.J.Super.* 518 (App.Div.), certif. den., 71 *N.J.* 498 (1976), also a medical malpractice case, in which the defendant, the operating physician, reassured plaintiff with a "slanted explanation" of the unhappy results of his treatment, 139 *N.J.Super.* at 524, the "suspicion" of which the court spoke was intended to convey the notion of disbelief, of distrust or incredulity in the face of the efforts of the prospective defendant (and, in *Lynch,* his colleague) to steer plaintiff

away from a malpractice claim. Beyond that narrow meaning in the context in which it was used in *Lynch* and *Alfone*, "suspicion" should not be taken as the touchstone for determining whether a plaintiff's cause of action accrues.

The point that *Lynch* and *Alfone* made was that in the face of defendant's reassurances, given within the doctor-patient relationship, there was no reason for those plaintiffs to suspect the defendant-physicians of deceit or dissembling. There was no reason for suspicion, hence the cause of action did not accrue. We are unwilling to extract from that proposition, however, a counter-proposition that "suspicion"—in the sense of an uninformed guess or of speculation without some reasonable medical support—of a causal connection between a physical condition and chemical exposure starts the running of the statute of limitations in a toxic tort case.

Our unwillingness is traceable in large part to that which we sought to make clear earlier in this opinion—the unusual nature of the toxic tort case. If, as we have concluded, the appropriate time for accrual of a cause of action for "discovery rule" purposes is when "the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered[,] that he may have a basis for an actionable claim," *Lopez v. Swyer, supra,* 62 *N.J.* at 272, then the nature of the information necessary and the quality of the requisite state of mind will of course vary from case to case, and more than that, from type of case to type of case.

Unlike cases such as *Viviano v. CBS, Inc., supra,* 101 *N.J.* 538 (malfunctioning record press machine), and *Tevis v. Tevis, supra,* 79 *N.J.* 422 (assault), it is not self-evident at the time of a toxic tort injury that the cause was (a) the fault of (b) a third party. Not only is the nature of the injury generally unclear, its very existence is frequently masked. See Nothstein, *supra* at 429. A California case states well the principle applicable in that circumstance:

When personal injury is suffered without perceptible trauma and by silent and insidious impregnation as a consequence of the act or omission of another, who knows, or is charged with the responsibility of knowing that such act or omission may result in personal injury, and the injured person is unaware of the cause of his injury, and as a reasonably prudent and intelligent person could not, without specialized knowledge, have been made aware of such cause, no action for a tort resulting from such cause begins to accrue until the injured person knows or by the exercise of reasonable diligence should have discovered the cause of such injury.
[*Warrington v. Charles Pfizer & Co.*, 274 *Cal.App.*2d 564, 569–70, 80 *Cal. Rptr.* 130, 133 (Ct.App.1969).]

Although the parallel to the instant case is not exact, Judge Pressler's opinion in *Mancuso v. Mancuso, supra,* 209 *N.J.Super.* 51, recognizes the principle we apply here—the necessity for reasonable medical information before a plaintiff may be deemed to have the requisite knowledge for accrual of a toxic tort cause of action. *Mancuso* involved a claim of causal relationship between an automobile accident and Parkinson's disease. Suit was started two years and nine months after the accident and eight months after plaintiff allegedly discovered the causal connection between the accident and her disease. 209 *N.J.Super.* at 54. The trial court granted summary judgment for defendants based on the suit being filed beyond the two years allowed under the statute of limitations. The Appellate Division reversed and remanded for a *Lopez* hearing. *Id.* at 59.

Although the existence of an actionable injury—apparently superficial soft tissue injuries of minimal consequence, *id.* at 53—was known shortly after the occurrence of the accident, what made the case "extraordinary" in the eyes of the court was the nature of the injury. As the court observed:

As a matter of common knowledge, all manner of physical ailments are associated with the effects of trauma. Consequently, the development of symptoms following the trauma which, as a matter of either common medical or lay knowledge, could possibly have been recognized as caused by the trauma must be regarded as providing the injured person with knowledge of his cause of action based thereon. The representation made to us here, however, is that the potential causal connection between a severe exacerbation of Parkinson's disease and an apparently minor trauma sustained in an automobile accident which apparently resulted only in negligible soft tissue injury is a matter of

such highly specialized medical knowledge that plaintiff cannot be reasonably chargeable with not having made that connection until she was so advised by the Lahey Clinic neurologist just a month after the running of the statute. If that representation were evidentially supported—*i.e.*, if a finding were made that plaintiff had no reason, by way of medical advice or otherwise, to associate her neurological condition with the trauma and if she should show that even with the exercise of reasonable diligence that causal connection would have remained unknown to her until that time—then a trial judge could be persuaded that this is indeed an extraordinary case eligible for the application of the discovery rule.

[*Id.* at 54 (footnote omitted).]

*See also Goodman v. Mead Johnson & Co.*, 534 *F.*2d 566 (3d Cir.1976), cert. denied., 429 *U.S.* 1038, 97 *S.Ct.* 732, 50 *L.Ed.*2d 748 (1977) (applying discovery rule of *Lopez*, court held summary judgment for defendant improperly granted in birth contraceptive drug case despite (1) plaintiff's admission of knowledge that there might be relationship between her disease and use of drug, (2) doctor's advice, labelled "equivocal," well within ordinary statutory period that she should stop using drug, and (3) consultation with attorney, likewise equivocal, within ordinary statutory period).

██ We conclude that the courts below attached insufficient weight to the inherent difficulty in diagnosing an injury caused by toxic chemicals as well as in discovering the cause of such an injury. As already pointed out, *supra* at 422–423, the "fact," relied on by the trial court, that plaintiff's headaches stopped after he left his employment with Chemical Control and that he "felt better" after that is exiguous support for the conclusion that "plaintiff should have known that his exposure to chemicals might have caused his symptoms," given the history of migraine, the role of stress in the cause, and the fact of medication in the cure. The same is true of the alternative basis for the grant of summary judgment for defendant below, namely, the uninformed—at least not medically informed—speculation after comparing notes with his friend Conlon and the at-best-equivocal information obtained from the treating physicians before March 12, 1980.

■ Given our requirement that before a toxic-tort-case plaintiff may be deemed, in a "discovery rule" context, to have the requisite state of knowledge that would trigger the running of the statute of limitations his impression of the nature of the injury and of its cause must have some reasonable medical support, we are convinced that defendants were not entitled to summary judgment. We hasten to add that we do not insist on medical confirmation as such: a physician's willingness to include chemical poisoning in the differential diagnosis would probably suffice, as would any other reasonably reliable source of information.

Here, however, Dr. Thurston's responses through March 13, 1980, were so equivocal as to lead only to the conclusion that no medical explanation could reasonably account for plaintiff's difficulties. It was not unreasonable, irresponsible, or dilatory for Vispisiano to interpret Dr. Thurston's response to his inquiries concerning the possible nexus between his symptoms and chemical exposure as an implicit conclusion that there was none. This is especially true in light of the fact that the record indicates that Dr. Thurston *never* diagnosed Vispisiano's symptoms as being caused by chemical exposure. In fact, Dr. Thurston later testified that Vispisiano's symptoms were not pathological, but psychological, caused by stress.

In addition, Vispisiano diligently followed Dr. Thurston's recommendation and sought the advice of Dr. Okie. "The decision to seek a second medical opinion in the face of unresolved medical problems is not uncommon and is a commendable course of action generally to be encouraged." *Lynch v. Rubacky, supra,* 85 *N.J.* at 76. This course of action, although not conclusive evidence, reinforces plaintiff's contention that Dr. Thurston said "no" concerning the possibility of a causal relationship between chemical exposure and Vispisiano's symptoms.

Moreover, because plaintiff still believed that his symptoms might be caused by a reaction to some food, Barbara Vispisiano

diligently kept a diary documenting her husband's intake of food and his health between May 1981 and March 15, 1982. Again, this evidence serves to reinforce plaintiff's position. Finally, the record indicates that plaintiff did not file his complaint until *after* he was tested by Dr. Okie in May, 1981, *before* having the causal relationship positively diagnosed by Dr. Daum in August, 1982.

The ultimate conclusion of the lower courts that plaintiff failed "either to act upon a state of knowledge of an actionable [tort] claim or to show reasonable diligence and intelligence to ferret out such a claim is not supported by the facts developed in the *Lopez* hearing." See *Lynch v. Rubacky, supra,* 85 *N.J.* at 77.

The judgment is reversed and the cause remanded to the Law Division.

CLIFFORD, J., concurring.

My long-held view in "discovery-rule" cases has been that the rule should not operate to start the running of the statute of limitations afresh with the discovery of a cause of action, but rather should function to give a plaintiff a reasonable time after discovery, up to what remains of the "traditional" statutory period, within which to file the complaint. See *Lynch v. Rubacky,* 85 *N.J.* 65, 78 (dissenting opinion); *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 293 (1978) (concurring opinion); *Moran v. Napolitano,* 71 *N.J.* 133, 142 (1976) (dissenting opinion); *Fox v. Passaic Gen. Hosp.,* 71 *N.J.* 122, 128 (1976) (dissenting opinion). Because that issue is not implicated in this case (arguably, plaintiff started suit even *before* his alleged cause of action accrued, that is, before he became, or should have become, aware of facts that equated in law with a cause of action, *see Burd v. New Jersey Tel. Co., supra,* 76 *N.J.* at 291). I write only to indicate that I have not abandoned my

position on that question; it remains as staked out in the minority opinions cited above.

I join fully in the opinion of the Court.

CLIFFORD, J., concurring in the result.

*For reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and STEIN—6.

*Opposed*—None.