LAUREN C. SOBECK, AN INFANT BY HER GUARDIAN AD LI-
TEM, JOANNE SILVIA SOBECK AND JOANNE SILVIA SO-
BECK, PLAINTIFFS, v. CENTENNIAL INSURANCE COMPA-
NY, DEFENDANT.

Superior Court of New Jersey
Law Division Essex County

Decided November 3, 1988.

*Melvyn H. Bergstein,* Attorney for plaintiffs, (*Greenbaum, Rowe, Smith, Ravin, Davis & Bergstein,* Attorneys: *Melvyn H. Bergstein,* Esq. and *Alice Beirne,* on the brief).

*Robert F. Colquhoun,* Attorney for defendant, (*Colquhoun & Colquhoun,* Attorneys; *Robert F. Colquhoun,* on the brief).

NEWMAN, J.S.C.

This case raises issues of first impression concerning the interpretation of the PIP benefit provisions of our No Fault law. *N.J.S.A.* 39:6A-1 *et seq.* The major issues projected are the applicable period of the statute of limitations under *N.J.S.A.* 39:6A-13.1, the entitlement to coverage for PIP benefits of an unborn child at the time of the accident and the cause and effect relationship between the stress experienced in an automobile accident and the onset of a premature birth one month later. The relative facts are as follows. The plaintiff Joanne Silvia Sobeck (hereinafter referred to as Ms. Sobeck) was in an automobile accident on November 1, 1982, when she was making a left turn to go into a parking lot of a bank. Her car was hit from behind and her abdomen struck the steering wheel. She was approximately twenty-one weeks pregnant at the time. The impact resulted in a damage estimate to her car of $210.

Ms. Sobeck was very concerned about her pregnancy and called her obstetrician Dr. Grodsky that very day. She was told to relax and elevate her feet. The next day she went to the doctor's office and saw his then associate, Dr. Rota. The examination revealed no abnormal findings. There was a fetal heartbeat and movement. However, between November 8 and November 13, Ms. Sobeck observed a number of changes with her body. She experienced pain in her lower back. She underwent orthopedic treatment for injuries to her neck. Ms. Sobeck testified that she began to feel less fetal activity after the accident. She noted that her vaginal discharge was watery. She also had a gushing sensation. She was examined again by Dr. Rota on November 14, 1982. Once again the examination

disclosed no abnormal findings. It was noted that the size of the uterus had declined three centimeters from a recording of twenty-one centimeters on October 18 to eighteen centimeters on November 14.

Her back pains got progressively worse and the fetal activity did not progress. She anticipated that she would be feeling increasing fetal activity when in fact that did not occur. On December 2, 1982, Ms. Sobeck started having contractions. Her cervix dilated to two to three centimeters when she was seen by Dr. Grodsky at the emergency room at Newton Hospital. He recognized that she was in labor. He arranged for immediate transportation to St. Joseph's Hospital where she delivered a premature child by way of a Cesarean section.

The child Lauren weighed 840 grams at birth. She experienced numerous difficulties associated with a premature birth such as respiratory distress, sepsis, intracranial hemorrhage and retinopathy. She also developed hydrocephalus requiring a ventricular peritoneal shunt. She remained in the hospital for 112 days and the expenses associated with the care, treatment and hospitalization approximate $105,000. These are the expenses that Ms. Sobeck seeks by way of PIP benefit payments.

Subsequent to the birth of her child Ms. Sobeck questioned whether or not there was any relationship between the auto accident and the premature birth. She was assured by Dr. Grodsky that there was none. She spoke to a representative of Centennial Insurance Company, Ana Wild, as to the daughter's medical expenses. She was advised that none of these expenses were covered under the policy. The company did not pay for an unborn child involved in an auto accident. As a consequence Ms. Sobeck never made a written claim for PIP benefits. She did however at the suggestion of Dr. Grodsky submit her bill for the delivery of Lauren for payment and that claim was rejected.

In March 1984 Ms. Sobeck consulted Dr. John T. Harrigan of the University of Medicine and Dentistry of New Jersey at New

Brunswick for pre-conception counselling. Knowing that she had given birth to a premature child, she was concerned about her ability to carry another child to term. She discussed the circumstances surrounding Lauren's birth with him, specifically, the car accident that had occurred one month before the birth. At this time Dr. Harrigan indicated that he believed there may be a causal connection between the auto accident and Lauren's premature birth. He needed additional information to consider the issue in a more comprehensive way. Upon further consultation and examination of relevant material, Dr. Harrigan was of a view that Ms. Sobeck suffered stress as a result of the accident and that such stress induced the premature birth. In February 1985 Dr. Harrigan rendered a formal opinion that the accident was causally related to Lauren's premature birth.

A law suit was filed on behalf of Lauren against her mother and the other driver involved in the accident on October 2, 1984. Lauren's mother was successful in being dismissed as a party when a summary judgment motion in that suit was granted on October 8, 1985. The present law suit seeking PIP benefits for the plaintiff Lauren Sobeck was commenced on January 2, 1986, within two years of when she first met with Dr. Harrigan and within four years of when the automobile accident occurred.

■ The first issue raised by the defendant Centennial Insurance Company (hereinafter referred to as Centennial) is that the statute of limitations is a complete bar to this action. The operative language of the statute *N.J.S.A.* 39:6A–13.1 reads:

a. Every action for the payment of benefits set forth in sections 4 and 10 of this act. except an action by decedent's estate, shall be commenced not later than 2 years after the injured person or survivor suffers a loss or incurs an expense and either knows or in the exercise of reasonable diligence should know that the loss or expense was caused by the accident, or not later than 4 years after the accident, whichever is earlier, provided, however, that if benefits have been paid before then an action for further benefits may be commenced not later than 2 years after the last payment of benefits.

The statutory provision in question is best described as a limited accrual type statute. In other words, an action must be

brought within four years of the date of the accident no matter what the circumstances may be. However, within that four year time frame, there is the flexibility of an accrual based claim. The proviso "either knows or in the exercise of reasonable diligence should know" constitutes standard accrual language which has been interpreted to allow a cause of action to arise when a person discovers that a claim may reasonably be pursued. *See, e.g., Lopez v. Swyer*, 62 *N.J.* 267, 272 (1973). Certainly, the inclusion of this language cannot be viewed as accidental on the Legislature's part.[1]

Ms. Sobeck did not learn of the potential causal connection between the accident and Lauren's premature birth until March 1984. It was not until February 1985 that Dr. Harrigan rendered a formal opinion making the connection. Therefore, it follows that the time Ms. Sobeck "knew, or exercised reasonable care to know" about the causal connection was March 1984 or at the latest February 1985.

The necessity for reasonable medical information before a party may be deemed to have the requisite knowledge for accrual of a cause of action is essential. *Lynch v. Rubacky*, 85 *N.J.* 65, 69–70 (1981); *Vispisiano v. Ashland Chemical Co.*, 107 *N.J.* 416 (1987); *Graves v. Church & Dwight Co., Inc.*, 225 *N.J.Super.* 49 (App.Div.1988). As the court in *Graves* remarked:

> [A] layman should not be charged with knowledge of cause and effect which he may suspect when the physicians who are treating him and who have the same factual information on which his own suspicions are based completely discount the validity of those suspicions. [225 *N.J.Super.* at 56.]

---

[1]See *Evernham v. Selected Risk Insurance Co.*, 163 *N.J.Super.* 132 (App.Div. 1978). Although this case was relied upon by the defendant, it is inapposite to the situation at bar. The *Evernham* case dealt with the application of the doctrine of equitable estoppel to prevent a defendant from pleading the statute of limitation. The court held that if reasonable time remains to meet the statute after cessation of any basis for continued reliance by the plaintiff on the conduct of the defendant the action will be barred if not filed in time. 163 *N.J.Super.* at 137.

Ms. Sobeck, as a lay person, cannot be held to a higher standard of medical knowledge than that of the medical community itself. Where her treating physicians did not make the connection, she cannot be expected to do so.

The facts here squarely fall within the base line of what the discovery principle was designed to remedy. A party who has not slept on her rights, but lacked all of the information and expertise necessary to alert her to a cause of action should not be barred from pursuing that cause of action when she is made aware.

The filing of the instant complaint on January 2, 1986, was within two years of when plaintiff should have known that the "loss or expense was caused by the accident." She was alerted to the connection for the first time in March 1984 when she consulted Dr. Harrigan. Even using that date as the earliest point in time, Ms. Sobeck was timely in pursuing the action.

Centennial next maintains that a fetus at the time of the accident would not be an eligible insured covered for PIP benefits.

PIP endorsement provides that basic PIP benefits will be paid "with respect to bodily injury sustained by an eligible insured person." An eligible insured person is defined as "the named insured or any relative of the named insured." "Relative" is defined as "a person related to the named insured by blood, marriage or adoption who is a resident of the same household as the named insured." "Person" is not defined.

The question is whether or not an unborn child is an eligible person. Insofar as principles of construction are concerned, it should be noted that there is no specific exclusion for unborn children. Moreover, the policy should be construed in a way most favorable to the insured because the legislative objective was to provide the broadest form of coverage for the receipt of PIP benefits.

The court in *Selected Risk Ins. Co. v. Allstate Ins. Co.,* 179 *N.J.Super.* 444, 448 (App.Div.1981) recognized as much when it observed:

> The Act provides that the named insured and members of the family residing within the household enjoy personal injury protection whenever any such individual sustains bodily injury as a result of an automobile accident ... It is important to note that the injuries need not have been sustained by or in the named insured's automobile; coverage is extended to the named insured and relatives within the household if bodily injuries are received as a result of any accident.

In affording coverage for a surviving child that sustains prenatal injury in an accident, we are well within the recognized causes of action for prenatal injuries. Under New Jersey law, a surviving child has a right of action in tort for prenatal injuries. *Smith v. Brennan,* 31 *N.J.* 353 (1960). If a surviving child has a right to sue for prenatal injuries based on wrongful conduct, then there is no reason why a surviving child should not be able to sue for prenatal injuries where fault is not even at issue. This is the objective of PIP coverage, to pay medical expenses as soon as possible after the accident, disregarding the fault concept.[2]

Out of state authority provides further support for the conclusion that an unborn child is a covered person. *See, Alabama Farm Bureau Mutual Casualty Insurance Co. v. Pigott,* 393 *So.*2d 1379 (Ala.Sup.Ct.1981) (Unborn child, subsequently born

---

[2]Our Supreme Court has recently in *Giardina v. Bennett,* 111 *N.J.* 412 (1988) mentioned other contexts in which the Legislature and the court have dealt with the consequences of the prenatal condition. Justice Handler, speaking for a unanimous court, described some of them:

> Thus, once born, children have been permitted to acquire rights or interests by way of inheritance or other devolution of property. *See, e.g., In re Ransom's Estate,* 89 *N.J.Super.* 224 (App.Div.1965) (acknowledging possibility of afterborn children to share in estate). Their interests may receive other protections even prior to birth. *See, e.g., Hoener v. Bertinato,* 67 *N.J.Super.* 517 (J & D.R.Ct.1961) (prior to birth permissible to order custody of child over to state so that, upon birth, state can order necessary medical treatment over parental objections). [111 *N.J.* at 425.]

Surely, it cannot be said that our Legislature and courts have been unresponsive to the rights of the unborn.

alive, was covered; child subsequently died.); *Peterson v. Nationwide Mutual Insurance Co.*, 175 *Ohio St.* 551, 197 *N.E.*2d 194 (Ohio Sup.Ct.1964) (fetus born alive was a person as used in insurance contract.); *Orange v. State Farm Mutual Automobile Insurance Co.*, 443 *S.W.*2d 650 (Ky.Ct.App.1969) (In excluding benefits to a child under a household exclusion clause, an unborn infant was a legal person with a separate existence of its own and a member of the class excluded from policy coverage.); *Craig v. IMT Insurance Co.*, 407 *N.W.*2d 584 (Iowa Sup.Ct.1987) (Unborn child, even if stillborn, would be a covered person as a family member of the insured.).

Under similar facts involving an uninsured motorist provision in *Craig v. IMT Insurance Co., supra,* the definitions of the insurance policy were virtually identical to the ones here. There, a pregnant woman was in an auto accident which resulted in the premature birth of her child. The language of the insurance policy included the term "person," although it was not defined. The term "family member" was defined as a person related to you by blood, marriage or adoption who is a resident of your household. The court stated: "Clearly, if the Craig's unborn child is a 'person' he is also related to the Craigs by blood and resided in their household." 407 *N.W.*2d at 587.

The court further noted that there was no specific exclusion for unborn children and held "because our case law supports insurance coverage and because we construe provisions in the light most favorable to the insured, we must view the term 'from the standpoint of what an ordinary [person] would believe it to mean.' " *Id.* Thus the court concluded coverage would be provided.[3] The result as to coverage here should be no different.

---

[3]Interestingly enough, Iowa, like New Jersey, does not consider an unborn child a person for a wrongful death action. *Graf v. Taggert,* 43 *N.J.* 303 (1964). Despite the lack of recognition of the unborn child in the wrongful death context, the *Craig* court was not reluctant to provide the unborn child with a cause of action under an insurance policy.

As to the issue of the child *en ventre sa mere* being a "resident of the same household as the named insured" the concurring opinion in *Alabama Farm Bureau Mutual Casualty Insurance Co. v. Pigott, supra,* made the most sensible response. The concurring judge had this to say about the term "resident of the same household":

> Here, however, the plain wording of this definition, when applied to the simple undisputed facts of this case, leaves room for one conclusion: this child, at all times material to the coverage issue, was a member of some household, and this was the household of his mother, which, in turn, was the household of the named insured. [*Alabama Farm Bureau Mutual Casualty Insurance Co. v. Pigott,* 393 *So.*2d at 1384.]

The same can be said of the fetus here. She occupied the same household as her mother. Accordingly, Lauren Sobeck was an eligible insured person under the policy at the time of the accident of November 1, 1982, residing in the household of the named insured, her mother.

■ Another defense argument that must be addressed is that no coverage should be afforded because no written demand for PIP benefits was ever submitted until the filing of this law suit. The argument, as will be shown, lacks merit.

*N.J.S.A.* 39:6A–5, the statutory provision permitting an insurer to require written notice of a PIP claim, reads as follows:

> An insurer may require written notice to be given as soon as practicable after an accident involving an automobile with respect to which the policy affords personal injury protection coverage benefits required by this act.

The liability policy under which this claim is being made, tracking some of the statutory language, provides:

> As soon as practicable the injured person or someone on his behalf shall give to the company written proof of the claim.

It is not disputed that no written proof of the claim was submitted on behalf of the infant prior to the institution of this suit. The reason that none was submitted is due to the fact that the company's representative Ms. Wild, advised Ms. Sobeck that no coverage existed for the infant. Centennial argues that Ms. Wild's death prejudices their defense by not being in a

position to have Ms. Wild testify. However, if she were called to testify, she would not be taking a position different from the one urged by Centennial here; namely, that coverage was not available for the infant's medical expenses. That position has steadfastly been maintained by Centennial. While it may be contended that, arguably, Ms. Wild might have testified that the conversation never took place, we do not see what prejudice befalls Centennial when the position taken here is consistent with what Ms. Sobeck understood the situation to be. She justifiably could have relied on what she was told. It should not now be held to work to her detriment.

Most significantly, there is absolutely no prejudice to Centennial. They were immediately made aware of the accident, had notice of Ms. Sobeck's PIP claim and represented her in the negligence action. No mention of prejudice is made as to investigation of either the accident or the claim by Lauren. Indeed, there could be none made.

While it may be true that no formal written application for PIP benefits was filed for the infant's injuries, the mother's benefits for the delivery of the child were denied by Centennial. Surely, the filing of a claim on Lauren's behalf would have fared no better. The law certainly does not require an act in futility to serve as a bar to a consideration of the issues of first impression raised by this case in the absence of prejudice to Centennial. That would be especially true here where threshold issues as to coverage are raised. While the statutory provision, *N.J.S.A.* 39:6A–5, permits an insurer to include a written notice requirement, it certainly does not do so at the expenses of a determination as to whether or not the policy affords personal injury protection coverage in the first place. Thus, the failure to submit written proof of the claim under the circumstances does not deprive Lauren of being heard as to whether PIP coverage benefits should be provided to the expenses incurred in her premature birth.

The further defense contention that the medical difficulties experienced by the infant and her premature birth as not being related flies in the face of the proofs. Both experts, Dr. John T. Harrigan and Dr. Sydney Wilchins, agree that the host of problems she suffered during her hospitalization, and following her premature birth represent the sequelae of that birth. Centennial's position on this issue is untenable based on its own witness's testimony, let alone that of Dr. Harrigan.

The final issue to be addressed and the one most testimonially contested deals with the cause and effect relationship of the accident to the onset of the premature birth. All of the medical witnesses agree that a car accident can be a stress inducing event to any person and, in this case, to a pregnant woman. The difference in their views can be traced to their acceptance or non-acceptance of the proposition that stress is medically recognized as a risk factor in bringing about births short of term.

Dr. Harrigan spoke of studies done in France by Dr. Papersnick, by Dr. Chiara in California and the March of Dimes risk scoring system.[4] Fatigue, anxiety and stress were seen as risk factors. He explained the physiological link between stress and uterine contractions and the onset of premature birth. According to him, the occurrence of stress releases a family of chemicals called catecholamines. These chemicals increase the heart rate, cause vascular constriction and increase the blood pressure. These changes also act on the uterine blood vessels,

---

[4]While these studies were mentioned, none of their results were testified to. In other words, we did not learn whether more pregnancies resulted in full term births in France when the pregnant female population was removed from the work force in the twentieth week of pregnancy. It may well be that there are no scientifically reliable results to report at this time. On the other hand, it is not significant for a consideration of the issue here since the proofs clearly establish that stress is a risk factor in pregnancy. Dr. Grodsky recognized as much in addition to Dr. Harrigan.

restricting flow of blood to the uterus, the placenta and the fetus. This decrease in the uterine blood flow in turn stresses the fetus, triggering off labor. At the same time, the decreased blood flow to the placenta decreases the production of a hormone which acts to quiet the uterus.

By contrast, Dr. Wilchins, described the unique capability of the human body to adjust to stress to alleviate any negative responses. According to him, a substance called epinephrine or adrenalin actually releases or relieves a contraction of the uterus. What results is that epinephrine acts as a natural buffer to stress related problems in pregnancy, assuring such a common problem as stress would not affect the ability of a mother to carry to term. Dr. Wilchins also recognized that a stress inducing occurrence such as an automobile accident affects people differently because each person's coping mechanisms are uniquely their own. In his view, there is no way to measure the changes that occur chemically as a result of stress. What is still unfortunately the case in Dr. Wilchins' view is that 60% of the causes of premature births remain unknown. That would be the strongest probability in Ms. Sobeck's situation; namely, a premature birth of unknown origin.

Brief mention of Dr. Grodsky should be made. He was Ms. Sobeck's treating obstetrician. He was of the view that for the accident to have brought on the premature birth, it would have had to occur in much closer time to the accident. He did recognize that stress could be a variable which could contribute to premature labor.

In applying this theory to the facts and medical documentation in this case, Dr. Harrigan's theoretical bone takes on its flesh. There is no question that Ms. Sobeck was acutely stressed by the accident and feared that she might lose the baby. While the accident itself did not result in much damage, it was a rear end hit and her abdomen did strike the steering

wheel of the car she was driving. Her examination the day following the accident by Dr. Rota did not result in any untoward signs being observed. Fetal heart rate and fetal motion were present. A pelvic exam found her cervix to be closed and no contractions. Dr. Rota reassured Ms. Sobeck that the pregnancy was normal.

Some twelve days later, Dr. Rota again examined Ms. Sobeck and again found no untoward symptoms. There was recorded however a decrease in the uterine size of three centimeters from the measurement taken on October 18.

Ms. Sobeck testified to her own sense of her pregnancy. She felt a decrease in fetal movement. She observed a change in vaginal discharge which she described as watery. She experienced a gushing sensation. She had backaches which increased in intensity from the date of the accident, instead of being alleviated as she distanced herself in time from the auto accident.

Dr. Harrigan considered the decrease in uterine size significant. Such decrease in size would not be attributable to a decrease in size of the fetus, but can only be explained by a partial leaking or perhaps partial rupture of the membranes. The gushing sensation she related was consistent as well with a partial leaking. The backaches she later experienced according to Dr. Harrigan were probably contractions but the accident had masked the ability to read them for what they were. In Dr. Harrigan's opinion, it may take seven to ten days of contractions for the uterus to develop a rhythmic enough pattern to change the cervix to its eventual dilation to two to three centimeters at which time the premature birth will occur. Had the birth occurred the day after the accident, Dr. Harrigan would not have viewed the accident as having had an effect on the premature birth. But, the symptoms experienced by Ms. Sobeck for this month's time, coupled with the decrease in

uterine size was consistent with and supportive of a stress induced premature birth due to the automobile accident.

In evaluating the evidence presented the court is mindful that the plaintiff bears the burden of proof in establishing that the premature birth was causally related to the automobile accident of November 1, 1982. This burden must be carried by a fair preponderance of the believable evidence. It is not the number of witnesses who testify that counts, but rather the quality of what the witnesses who are called have to say. In this regard, Dr. Harrigan has the clear edge. His specialty of maternal fetal medicine was demonstrated by his knowledgability in the specific area that had to be addressed. He tied the pregnant woman's pre and post auto accident history to his theory of the etiology of stress induced premature birth in a clear, convincing and documented fashion. Further, Ms. Sobeck, a pharmacist by occupation, was particularly able to verbalize just how her pregnancy underwent change following the accident. She appeared to be very sensitive to the nuances of her own body chemistry and conveyed this information in a credible manner.

By the same token, I found that the testimony of Dr. Rota and Dr. Grodsky was credible as to the treatment of Ms. Sobeck. Contrary to plaintiff's suggestion that these two doctors still have some self interest in protecting their own conduct in the handling of this particular pregnancy, I disagree. Their management of the patient was even appropriate in 1982 according to Dr. Harrigan. The best thing that could be done for Ms. Sobeck following the accident was to reassure her that her pregnancy was intact and unaffected absent abnormal findings. That was done. Reading the backaches as possible contractions was at best extremely difficult, where the injury to that area of her body was consistent with the accident as well as a not uncommon symptom experienced by pregnant women generally.

Dr. Wilchins also struck the Court as a knowledgeable and forthright witness. He was not without substantial credentials.

But, as previously mentioned, he did not have the experience in the sub-specialty area of at risk pregnancies that Dr. Harrigan possessed. While the court recognizes that there is a trace of salesmanship in Dr. Harrigan's testimony since his interest and work effort is largely devoted to high risk pregnancies and how to shepherd them through to term, he still was able to provide a very credible and documented explanation of the stress induced onset of premature birth in this case. His testimony along with that of Ms. Sobeck herself tipped the scales to enable the plaintiff to carry the burden of showing a causal relationship between the auto accident of November 1, 1982, and the premature birth of December 2, 1982. While it may very well be that another person may have coped better with the stress of the accident than Ms. Sobeck did, that should not work against her in seeking PIP benefits for her daughter's premature birth and the disabilities attributable to it. The law requires that you take Ms. Sobeck as you find her.

In sum, this court is satisfied by a fair preponderance of the believable evidence that (1) stress is a medically recognized risk factor for bringing on premature labor and birth; (2) the auto accident of November 1, 1982, and its effects upon Ms. Sobeck while she was some twenty-one weeks pregnant caused her to experience acute stress; (3) the stress she personally experienced induced premature labor and led to the premature birth of her daughter. The infant, as an eligible insured under her mother's automobile insurance policy would be entitled to payment of PIP benefits. The expenses incurred for care, treatment and hospitalization of the premature birth and the sequalae of disabilities that followed were, as testified to without contradiction, reasonable and necessary. These expenses total $105,387. An appropriate order of judgment, consistent with this opinion, should be submitted by plaintiff's counsel under the five day rule.