DONALD R. WARD, APPELLANT, V. CITY OF ALLIANCE, NEBRASKA,
APPELLEE.
417 N.W.2d 327

Filed January 8, 1988.   No. 85-906.

Robert W. Mullin of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellant.

Francis L. Winner of Winner, Nichols, Douglas, Kelly and Arfmann, for appellee.

BOSLAUGH, C.J., Pro Tem., WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J.; Retired.

HASTINGS, J.

The plaintiff has appealed from a judgment in favor of the City of Alliance in his action under the Political Subdivisions Tort Claims Act. That judgment was based on the running of the statute of limitations.

In July of 1981, the plaintiff was an employee of the city of Mitchell. It had purchased part of an electrical substation, including a transformer, from the City of Alliance. As part of his duties for the city of Mitchell, the plaintiff dismantled this equipment in preparation for its move to Mitchell and in September began assisting in reconstructing this same equipment after it arrived in Mitchell. As a part of this operation, it was necessary for the plaintiff to have his arms in oil, contained in the transformer, for extended periods of time.

This oil was later found to contain PCB (polychlorinated biphenyl), a toxic substance. Plaintiff was hospitalized several times after that for excessive fatigue, weakness, and numerous physical complaints. As a proximate result of such exposure, plaintiff alleged in his pleadings, he suffered severe illnesses, including liver damage, multiple physical illnesses, pain, and total permanent disability.

According to the record, the city of Mitchell had filed a workers' compensation report of injury in which it alleged illness on the part of the plaintiff, resulting from exposure to transformer oil while doing maintenance on a transformer. This report was dated January 27, 1982, and alleged that plaintiff had been feeling ill for about 6 weeks as of December 16, 1981, and was hospitalized for tests on January 11, 1982.

On March 8, 1982, a trade magazine, Public Power Weekly, published an article, entitled "Neb. utility superintendent is ill from exposure to PCBs," disclosing results of an interview with plaintiff a week earlier. The article, in relevant part, provides:

"I remembered I'd been working on a transformer shortly before Thanksgiving and it occurred to me the oil could have contained PCBs" Ward said last week.

"Doctors asked me if I'd been around any toxic

chemicals and I said no. Then I remembered I'd spent two days with my arms immersed to my elbows in transformer oil repairing an old transformer which we bought used from another municipality," he said.

A test on a sample of the transformer oil shows it contained 229 parts per million of PCBs. . . .

. . . .

. . . He [Ward] said he experiences severe headaches, terrible weakness, abnormal appetite, itching on his arms and aching in his shoulder, knee, and arm joints. His vision sometimes seems impaired too, he said.

. . . .

Doctors plan to do further tests on his liver. He is being treated by his local family physician and expects to see a specialist in Chicago, Dr. Daniel Hryhorczuk, who has done research on the effects of PCBs.

The plaintiff testified by deposition that in January of 1982 he suspected PCB contamination and directed three of his employees to have tests run on their blood.

Plaintiff argues in his brief that among the various medical personnel there was an inability to develop and stick with a definitive diagnosis throughout the period from July 1981 through 1985. He continues by pointing out that in late 1983, the treating physician could not give a definite opinion of causation. However, in a letter dated October 11, 1983, that same physician wrote: "The possibility of PCB poisoning came to our attention in November of 1981 in regard to Mr. Ward . . . ."

On April 6, 1985, the plaintiff reported to his attending physician with a suspicious lesion on the right side of his nose, which was excised and submitted for laboratory analysis which disclosed it to be a basal cell carcinoma.

The claim in this case was filed against the City of Alliance on November 11, 1983, and the petition was filed in the district court on April 19, 1985.

Dr. Janette D. Sherman, a toxicologist, testified that she reviewed the plaintiff's records and examined him on August 20, 1985, and, as a part of that examination, she reviewed certain of plaintiff's medical records. She gave as her opinion that the cause of the basal cell carcinoma was plaintiff's

exposure to PCB. Additionally, although the testimony is a trifle vague, Dr. Sherman suggested that if she had been given the history and laboratory reports which were available in 1981, she could have made the diagnosis of exposure to PCB at that time. Dr. Sherman also commented that Dr. Lowell A. Stratton, plaintiff's local physician, did an outstanding job of diagnosing possible PCB involvement as early as June of 1982.

The trial in this case was bifurcated and, at the outset, concerned only the issue of the statute of limitations. At the close of all of the evidence the district court concluded that attaching a discovery exception to Neb. Rev. Stat. § 23-2416 (Cum. Supp. 1984), as was mandated by this court in *Spath v. Morrow*, 174 Neb. 38, 115 N.W.2d 581 (1962), with respect to Neb. Rev. Stat. § 25-208 (Reissue 1964), would result in a bar to the present action.

Section 23-2416 requires that every claim against a political subdivision shall be forever barred unless a claim in writing is made within 1 year after such claim accrued. Additionally, all lawsuits permitted by that section must be brought within 2 years after such claim accrued, with certain exceptions which we need not discuss here.

Specifically, the trial court found that the evidence established that by March 9, 1982, if not earlier, the plaintiff had sufficient information to trigger the running of the time requirements and that he failed to file a notice of his claim or commence suit within the time stated in the statute. Because plaintiff's claim was not filed with the City of Alliance until November 11, 1983, which we find is well beyond the requirements of § 23-2416, we need not discuss the matter of the filing of the petition.

As previously stated, every claim against a political subdivision shall be forever barred unless a claim in writing is made within 1 year after such claim accrued. The critical question then becomes, When did the claim accrue?

The general rule in tort law is that a claim "accrues" at the time of the plaintiff's injury, but this rule has been modified in many jurisdictions to provide that such accrual does not occur until the injury has manifested itself. *United States v. Kubrick*, 444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979). *Kubrick* is

cited for the proposition that an action accrues when a plaintiff learns, or in the exercise of reasonable diligence should have learned, of the injury and the actions that caused it.

This court, as early as *Spath v. Morrow, supra,* applied a discovery rule to avoid the harshness of a strict statute of limitations application in a medical malpractice case under then-existing § 25-208. A judicial exception to § 23-2416 should be wholly consistent with the discovery exception to § 25-208 carved out by *Spath.*

The case of *Condon v. A. H. Robins Co.,* 217 Neb. 60, 349 N.W.2d 622 (1984), involved a personal injury upon use of a defective product. A discovery rule was applied, with the statute of limitations beginning to run "on the date on which the party holding the cause of action discovers, or in the exercise of reasonable diligence should have discovered, the existence of the injury or damage." *Id.* at 68, 349 N.W.2d at 627. The court went on to clarify:

> By applying a discovery rule to ·§ 25-224(1), we are not providing that the statute of limitations does not begin to run until someone advises an individual either that the injury or damage which they already know they have sustained is actionable or advises them who it is that should be sued. Discovery, as we apply it to § 25-224(1), refers to the fact that one knows of the existence of an injury or damage and not that one knows he or she has a legal right to seek redress in the court.

*Id.*

A cause of action accrues, then, and the statute of limitations begins to run, when the aggrieved party has the right to institute and maintain suit, even though such plaintiff may be ignorant of the existence of the cause of action. *Mangan v. Landen,* 219 Neb. 643, 365 N.W.2d 453 (1985). See *Interholzinger v. Estate of Dent,* 214 Neb. 264, 333 N.W.2d 895 (1983). Also, 54 C.J.S. *Limitations of Actions* § 205 at 216 (1948) provides: "In the absence of a statute providing otherwise, ignorance of the existence of a cause of action ordinarily does not toll the statute of limitations, particularly where the facts may be ascertained by inquiry or diligence."

*Condon* cited the federal case of *Davis v. United States,* 642

F.2d 328 (9th Cir. 1981), *cert. denied* 455 U.S. 919, 102 S. Ct. 1273, 71 L. Ed. 2d 459 (1982), which presents an analogous situation under the Federal Tort Claims Act. The plaintiff in *Davis* was the recipient of an oral polio vaccine who suffered paralysis as a result. The court held that the 2-year limitations period began to run when the plaintiff knew that the vaccine was the likely cause of injury. The court placed the burden on the "plaintiff to ascertain the existence *and source* of fault within the statutory period." (Emphasis supplied.) 642 F.2d at 331.

The court in *Davis* drew heavily upon the *Kubrick, supra*, opinion. *Kubrick* involved an action under the Federal Tort Claims Act wherein a patient was treated with an antibiotic at a Veterans' Administration hospital. The petitioner had argued that the negligence question was technically complex, but, as with this malpractice case, the Court noted that in most negligence cases "determining negligence or not is often complicated and hotly disputed." 444 U.S. at 124. The Court refused to hold that " 'accrual' of a claim must await awareness by the plaintiff that his injury was negligently inflicted." 444 U.S. at 123.

A plaintiff may be advised or may be wrongfully advised by both the medical and legal fields, but "the putative malpractice plaintiff must determine within the period of limitations whether to sue or not, which is precisely the judgment that other tort claimants must make." 444 U.S. at 124. Again, the Court would not hold that "the statute is not to run until the plaintiff is led to suspect negligence . . . ." *Id*. Ward claims that he did not know the cause of his injury, but because causation is an element of negligence, the *Kubrick* holding should be dispositive of Ward's claim.

On policy grounds, the *Kubrick* Court noted the statute of limitations' obvious purpose—to encourage prompt presentation of claims. It referred to the plea of limitations as a " 'meritorious defense, in itself serving a public interest.' *Guaranty Trust Co. v. United States*, 304 U.S. 126, 136 (1938)." *United States v. Kubrick*, 444 U.S. 111, 117, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979).

In the present case, plaintiff was aware in January 1982 that

he had been injured and that PCB toxins in the transformer oil were the likely cause of his injury. These facts were so stated in an accident report filed for workers' compensation purposes at that time. At the very latest, in March 1982, plaintiff was certainly aware that PCB was the cause, when he disclosed the details of his illness and claim to a public magazine. In the magazine interview plaintiff remembered having spent 2 days shortly before Thanksgiving with his arms immersed to his elbows in transformer oil while at work. Plaintiff listed his injuries in detail. The interview continued that one day between January and March of 1982, while plaintiff was home resting, he recalled having it occur to him that the oil could have contained PCBs. The results of this interview, coupled with the fact that plaintiff had gathered enough information to claim workers' compensation benefits, charge plaintiff with the ability to have filed a notice of claim and suit against defendant at that time. Plaintiff knew the cause. Plaintiff knew PCB was the culprit.

If anything, medical advice incited plaintiff's suspicions regarding PCB in the oil. It is true, however, that there are always numerous possible causes when it comes to medical problems and that plaintiff received some mixed signals, e.g., "undiagnosed disease," "poisoning unlikely," no answer as to illness, and normal medical profiles on other coworkers. Plaintiff still cannot possibly claim that he did not know about his case until November 11, 1982, which is the latest discovery date for plaintiff's filing and suit to be timely. The workers' compensation claim and the magazine interview are proof enough for this court to effectuate the rationale behind the limitations rule—prompt presentation of claims.

Although not cited in either brief, the applicable law on discovery is perhaps best summarized in *Dawson v. Eli Lilly and Co.*, 543 F. Supp. 1330 (D.D.C. 1982), a case involving diethylstilbestrol (DES) and its effects on daughters of women who took the drug during pregnancy. The statute of limitations runs when plaintiff (1) knows or should have known of both the injury and the cause of harm or (2) has some awareness or imputed awareness that his injuries were the result of some wrongdoing on the part of the defendant. This does not mean

that plaintiff has to (1) be aware of all the elements of a legal cause of action, (2) be aware of the probability of success in such a lawsuit, or (3) have his knowledge of wrongdoing rise to the level of certainty.

Without deciding whether the "discovery" rule in fact applies to § 23-2416, there is ample evidence in the record to suggest that plaintiff knew or should have known on or before March 9, 1982, that PCB in the oil was the cause of his injuries. Because it cannot be said that the district court was clearly wrong in its factual finding that the defendant met its affirmative defense of the statute of limitations, the judgment of the district court should be affirmed.

AFFIRMED.

SHANAHAN, J., dissenting.

This court's majority has concluded that Ward "knew or should have known that PCB in the oil was the cause of his injuries on or before March 9, 1982," and, therefore, the statute of limitations began to run from that time and eventually barred Ward's claim filed against the City of Alliance on November 11, 1983. However, a careful analysis of the facts, especially information available to Ward concerning the cause-and-effect relationship between PCB and his injuries, compels a contrary conclusion. Ward's complete medical history, disregarded by the majority, and the status of medical knowledge about PCB are important factors in determining whether Ward knew, or should have known, about the cause of his injury, and are crucial components in the accrual of Ward's cause of action. A principle or rule of law has vitality and validity of application only when placed in the proper perspective of a particular factual context. Therefore, facts in addition to those recounted by the majority are necessary to demonstrate the majority's erroneous conclusion resulting from an incorrect application of law.

Since the early 1970s, Ward has suffered from hypertension and chronic hepatitis. One suffering from hepatitis will frequently display "classic" symptoms such as vomiting, fatigue, or feeling "wiped out." Sometime in July 1981, Ward began his encounters with a transformer later discovered to contain PCB. Early in August 1981, Ward contacted his family

physicians, general medical practitioners who comprised the Mitchell Medical Center in Mitchell, Nebraska. Ward complained of his fatigue and a cold sweat with slight nausea. One of Ward's attending physicians expressed "[f]ear that PT [Ward] may have deep vein thrombophlebitis and/or a collagen disease of unknown cause." A venogram, performed on August 5, was negative. However, Ward manifested swelling, pain, and erythema in his left leg. Erythema is abnormal redness or inflammation of the skin. On August 13, Ward's physician noted: "Inflammatory disease of unknown origin." Medications prescribed for Ward included prednisone, which is an anti-inflammatory steroid more potent than cortisone, and Catapres, a drug which lowers blood pressure but produces the side effect of fatigue. For the balance of 1981, Ward was tested for hypertension and his persistent swelling. On December 31, Ward's attending physician included among his professional impressions: "Illness of undetermined origin."

At the date of January 4, 1982, the attending physician's impression was still "[d]isease of unknown cause." After extensive testing regarding Ward's liver and gall bladder and his physician's consultation with an internist, Ward was admitted to a local hospital. On discharge from the hospital, according to Ward's attending physician: "[W]e didn't have a diagnosis." Later, on January 16, one of Ward's physicians, Dr. Lowell A. Stratton, asked Ward whether he had ever been around any toxic chemicals. Prompted by the physician's inquiry, Ward then recalled that in November 1981, he had immersed his arm in a transformer's transmission oil, and later informed his physician, on January 23, that a very recently received report, requested by Ward, reflected the presence of PCB in the analyzed transmission oil. At this chronological point, without any basis in the form of a physician's diagnosis, Ward gave an interview published on March 8 in the Public Power Weekly. On March 11, according to Dr. Stratton, Ward exhibited "[m]ultiple physical complaints, etiology unknown" and had a history of "exposure to toxic materials, etiology unknown at this time." On March 27 Ward's physicians noted: "We still cannot really definitively make the dx [diagnosis] . . . ." The Armed Forces Institute of Pathology rendered a report on

April 7, 1982, concerning a biopsy of Ward's liver, and stated:

> Chronic liver disease, type undetermined (?chronic active hepatitis)....
>
> ....
>
> ... PCB, to which the patient may have been exposed, can cause hepatic dysfunction during acute toxicity, can accumulate in the liver, and has been shown to cause chronic toxicity in animals....
>
> Some additional history might be helpful in providing better clinical-pathologic correlation. . . . Thank you for sharing this interesting case with us.

When Ward continued to experience fatigue and muscle aches, his physicians, on April 13, had the further impression: "Appears to be a chronic active hepatitis according to the [Armed Forces] Institute of Pathology tho cannot r/o the toxic exposure . . . . If it is chronic active disease, the Prednisone should give him good results." When Ward was hospitalized in June, the admitting physician, Dr. Stratton of the Mitchell Medical Center, felt there was a "possibility of multiple causes for [Ward's] hospitalization and symptoms . . . ." Later in 1982, Dr. Stratton suggested that Ward seek sources of additional information about the "toxicology problem," because, "Possibly there is a different disease coming on than the toxicology." As the result of another biopsy of Ward's liver, a local pathologist rendered the diagnosis that Ward's condition was "chronic active hepatitis." During Ward's hospitalization in September 1982, an examining physician's "assessment" of Ward's condition recited: "Consider exacerbation of chronic active hepatitis . . . . Unlikely PCV [sic] poisoning . . . . Hepatitis, etiology unknown, past history of." On October 18, Dr. Stratton told Ward that his diagnosis was "chronic active hepatitis, probably triggered by his previous hepatitis and probably not made any better by his exposures to, at least historically, toxic materials . . . ." Ward's fever, aching, severe fatigue, and nausea continued.

From clinical "evidence" or Ward's manifestations in February 1983, Dr. Stratton felt that there was a "direct toxic effect from chemicals that [Ward] got involved with in regard to the transformers," but in August 1983, Dr. Stratton still "was

not sure that the PCB was the cause and effect of [Ward's] disease. He had been exposed to PCB but [I] was not sure that — at that point it was causing his illness." Dr. Stratton decided, on September 12, that he should make a "[r]echeck of chronic disease felt to be toxic exposure to transmission oil." The majority places some emphasis on Dr. Stratton's letter of October 11 to a workers' compensation insurance adjuster, namely, the doctor's comment about a "possibility of PCB poisoning" in 1981. However, the majority has apparently overlooked the balance of that October 11 letter in which Dr. Stratton stated that he had written for medical literature on PCB relative to Ward's illness, expected to receive those publications within 2 weeks, and hoped the requested material "will help . . . make a . . . concise diagnosis." Dr. Stratton acknowledged that on December 13, 1983, he was "still searching for causation of Mr. Ward's problems."

In February 1984, Dr. Stratton stated that his "diagnosis is still at large" concerning Ward. Dr. Stratton later consulted with a toxicologist in Denver, Colorado, who examined Ward in March 1985, a specialist who felt that Ward had experienced an exposure to PCB. As far as the record reflects, medical expertise regarding PCB was unavailable in Mitchell, Nebraska, and was unavailable in the State of Nebraska itself.

Concerning PCB as a carcinogen, Ward offered the testimony of Dr. Janette D. Sherman, a Michigan internist with a subspecialty in toxicology, who worked with occupational environmental questions. Regarding general medical knowledge about PCB as a carcinogen, according to Dr. Sherman, "Not many physicians are cognizant . . . are not well read in the field of toxicology" and the number of physicians who would have been familiar with PCB poisoning was "very few," especially in 1982. In view of the previous diagnosis of hepatitis in Ward, Dr. Sherman distinguished the types of hepatitis and then described the symptoms of PCB poisoning: muscular pain, weakness, profound fatigue, vomiting, headache, and fever—the same clinical evidence or symptoms used for the hepatitis diagnosis of Ward. To diagnose PCB poisoning, an internist-toxicologist utilizes a patient's history, toxicological samples, and medical studies, but, as noted by Dr.

Sherman, test studies of PCB related only to laboratory animals "because it's unethical to experiment on human beings . . . ." Based on such medical data, a specialist can then extrapolate backward to arrive at a diagnosis of PCB poisoning.

In response to the question whether a diagnosis of Ward's PCB poisoning was possible in 1981, Dr. Sherman expressed her view that if she, an internist-toxicologist, would have had all the data concerning the occurrences in Ward's situation, including medical events before and after 1981, such a diagnosis would have been possible, but as Dr. Sherman expressed about a 1981 diagnosis:

> Well, if all the data had been available to me, if the assay of the transformer and the capicitor [sic] had been available to me, if the assay of the tissue had been available and the glove, and if the biopsy report had been available to me, and the course of his clinical history had been available to me I could have. But, unfortunately, it took a long time to put it all together.

Therefore, the hypothetical 1981 diagnosis, as pointed out by Dr. Sherman, was dependent on much information which was nonexistent in 1981 or which became available much later in Ward's treatment; for example, the analytical determination in 1982 that transformer oils contained PCB, the various 1982 reports by pathologists, a well-established medical history for Ward, and corroborative clinical manifestation of Ward's condition, which, in 1981, was incipient and medically undefined. Much of that dearth of diagnostic data existed when Ward gave his interview to the Public Power Weekly. While the majority describes Dr. Sherman's testimony as "a trifle vague" regarding a possible diagnosis of Ward's condition in 1981, a more fair characterization of Dr. Sherman's testimony is astonishment, even disbelief, that a physician would be asked and, moreover, could be reasonably expected to render a sensible and medically acceptable diagnosis in the absence of information necessary to determine the cause of a patient's condition.

The majority believes Ward's interview, appearing in the March 8, 1982, issue of Public Power Weekly, is evidence that

Ward knew that PCB was the cause of his condition. In the correct chronological and medical sequence, Ward's statements are mere suspicion without reference to a medically acceptable cause-and-effect relationship between PCB and his illness. Although stated as a principle applicable in a workers' compensation case, a fundamental principle regarding a claim for bodily injury has been previously announced by this court, but is now overlooked:

" 'Where the claimed injuries are of such a character as to require skilled and professional persons to determine the cause and extent thereof, the question is one of science. Such a question must necessarily be determined from the testimony of skilled professional persons and cannot be determined from the testimony of unskilled witnesses having no scientific knowledge of such injuries.' The employee must show by competent medical testimony a causal connection between the alleged injury, the employment, and the disability." [Citing and quoting from *Mack v. Dale Electronics, Inc.*, 209 Neb. 367, 307 N.W.2d 814 (1981).]

An award of compensation may not be based on possibilities or speculative evidence. [Citation omitted.] Thus, the mere possibility that a disability arose out of and in the course of employment does not satisfy the claimant's burden of proof.

The claimant, Caradori, having only proved that the disability could have been caused by an accident arising out of and in the course of employment has not sustained her burden of proof.

*Caradori v. Frontier Airlines*, 213 Neb. 513, 516-17, 329 N.W.2d 865, 867 (1983). Disregarding the basic tenet of *Caradori*, the majority has now elevated a layman's imagination without proof to the dignity of an expert witness' opinion which would otherwise be acceptable only with an adequate basis of scientific information or specialized knowledge.

In *Vispisiano v. Ashland Chemical Co.*, 107 N.J. 416, 527 A.2d 66 (1987), the New Jersey Supreme Court considered the discovery rule relative to a tort claim for bodily injury caused

by toxic chemicals. Vispisiano was exposed to the toxic chemicals in 1977 and was treated in 1978 for exposure to those chemicals. Vispisiano filed a suit in 1982 for personal injuries resulting from exposure to the toxic chemicals, some 2 years after expiration of the 2-year statute of limitations on negligence claims under New Jersey law. Evidence disclosed that approximately 2 years before he filed his suit, Vispisiano had visited with a coemployee who was experiencing a similar condition which may have been attributable to the same toxic chemicals to which Vispisiano had been exposed. Vispisiano informed his attending physician about such suspected causation in view of the coemployee's similar condition and symptoms. After a series of medical examinations were initiated in 1978, but failed to produce an etiology for Vispisiano's illness, in 1982 a physician diagnosed exposure to toxic chemicals as the cause of Vispisiano's condition. The New Jersey Supreme Court acknowledged that Vispisiano " 'expressed his suspicions that his own symptoms were caused by chemical contamination in his system' " and concluded that, more than 2 years before filing his suit, Vispisiano clearly knew that exposure to chemicals might have caused his injuries. 107 N.J. at 424-25, 527 A.2d at 70. In reversing a summary judgment granted to the defendants on the basis of the statute of limitations, the New Jersey court observed and held:

[T]he critical question in this case is when Vispisiano discovered or should have discovered, by exercise of reasonable diligence and intelligence, that the physical condition of which he complains was causally related to his exposure to chemicals at Chemical Control. . . .

Among the factors to which courts look in deciding whether a plaintiff is equitably entitled to the benefit of the "discovery rule" are the nature of the injury and the difficulty inherent in discovering certain types of injuries. [Citations omitted.] In the typical toxic tort situation those obviously interrelated factors may radically alter the balance of interests.

107 N.J. at 427-28, 527 A.2d at 72.

"[M]any diseases which are induced by or aggravated by exposure to toxic substances are similar to diseases which

are not related to that particular toxic exposure." *Id.*, § 4.01 at 105. "These diseases tend to express themselves in the same manner regardless of the precipitating agent, and it is rare that diagnosis of the disease in a particular individual will unequivocally indicate either the causative agent or the source of that agent.

. . . .

In a standard accident tort action, the injury, its cause, and its origin are easy to identify. In the toxic tort arena, the medically diagnosed injury is the first in a series of difficult facts to discover and allege. The latency period associated with many toxic substance diseases is a major hurdle in the causation chain." [Citing and quoting from G. Nothstein, Toxic Torts: Litigation of Hazardous Substance Cases §§ 4.01 and 13.04 (1984).]

107 N.J. at 429, 527 A.2d at 73.

The obvious argument is that when the proofs demonstrate an "arousal" of a plaintiff's "suspicion"—here, that Vispisiano's symptoms were caused by chemical exposure—the cause of action accrues and the statute of limitations begins to run.

. . . .

. . . "[S]uspicion" should not be taken as the touchstone for determining whether a plaintiff's cause of action accrues.

. . . We are unwilling to [formulate a proposition] that "suspicion"—in the sense of an uninformed guess or of speculation without some reasonable medical support—of a causal connection between a physical condition and chemical exposure starts the running of the statute of limitations in a toxic tort case.

107 N.J. at 433-34, 527 A.2d at 75.

If, as we have concluded, the appropriate time for accrual of a cause of action for "discovery rule" purposes is when "the injured party discovers, or by the exercise of reasonable diligence and intelligence should have discovered[,] that he may have a basis for an actionable claim;" [citation omitted] then the nature of the information necessary and the quality of the requisite

state of mind will of course vary from case to case, and more than that, from type of case to type of case.
107 N.J. at 434, 527 A.2d at 75-76.

The New Jersey Supreme Court in *Vispisiano v. Ashland Chemical Co.*, 107 N.J. 416, 527 A.2d 66 (1987), concluded that a claimant's specialized knowledge, to trigger the statute of limitations as a bar to an action for personal injury without perceptible trauma, requires "medical information before a plaintiff may be deemed to have the requisite knowledge for accrual of a toxic tort cause of action." 107 N.J. at 435, 527 A.2d at 76.

In a similar manner, the court in *Dubose v. Kansas City Southern Ry. Co.*, 729 F.2d 1026 (5th Cir. 1984), recognized that the discovery doctrine applied to a plaintiff's negligence claim against the defendant railroad for exposure to noxious material. In *Dubose*, the court stated:

> [T]he discovery rule [is] to be applied in differing fact situations to effectuate the rationale behind the rule. In most cases a plaintiff will have actual knowledge of his injury no later than the time when he should have known he was injured. The discrepancy may be greater, however, between actual knowledge and constructive knowledge of the fact of causation. When a plaintiff may be charged with awareness that his injury is connected to some cause should depend on factors including how many possible causes exist and whether medical advice suggests an erroneous causal connection or otherwise lays to rest a plaintiff's suspicion regarding what caused his injury.

729 F.2d at 1031.

Without a physician's diagnosis predicated on diagnostic data, Ward did not know that PCB was the cause of his injury and condition. Ward's self-diagnosis is quintessential conjecture and speculation by one without any medical training. To say Ward should have known that PCB was the cause of his condition charges Ward with a degree of scientific information and specialized knowledge absent throughout the general medical community, that is, esoteric understanding possessed by a relatively few internists with a subspecialty in toxicology.

The district court's judgment was clearly incorrect and should have been reversed with remand to the district court for a trial on the merits.

WHITE, J., joins in this dissent.